# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| DEWANDA DENISE COPPAGE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:13-CV-405-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
|     Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Dewanda D. Coppage on November 13, 2013, and Plaintiff's Brief in Support of Her Motion to Reverse the Decision of the Commissioner of Social Security [DE 12], filed on March 28, 2014. Plaintiff requests that the February 14, 2014, decision of the Administrative Law Judge denying her claims for supplemental security income be reversed for an award of benefits or remanded for further proceedings. On July 7, 2014, the Commissioner filed a response, and Plaintiff filed a reply on July 21, 2014. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for supplemental security insurance benefits on December 6, 2010, alleging an onset date of June 1, 2010. Her initial claim was denied on June 9, 2011, and her request for reconsideration was denied on July 25, 2011. Plaintiff timely requested a hearing, which was held on August 30, 2012. Following the hearing, Administrative Law Judge ("ALJ") Edward P. Studzinski issued a written decision denying benefits and making the following findings:

1.     The claimant has not engaged in substantial gainful activity since December 6, 2010, the application date.

2.     The claimant has the following severe impairment: status-post bypass surgery; status-post right ventricular fistula; diabetes mellitus with peripheral neuropathy; and mood disorder.

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a), as the claimant can lift and/or carry 10 pounds occasionally and lighter weights more frequently; stand and/or walk for 2 hours; and sit for 6 hours in an 8-hour work day. The claimant can stand or walk for no more [than] 15 minutes at any time before needing to sit briefly; and she can sit for no more than an hour at a time before having to stand and/or walk for 5 minutes without abandoning her work tasks. The claimant cannot climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, and crawl. The claimant can never reach overhead with her left non-dominant upper extremity; and can frequently perform fine and gross manipulation with her left non-dominant upper extremity. The claimant is unlimited in her ability to use her dominant right upper extremity. The claimant can never be around unprotected heights, large bodies of water, unexposed flames; and must avoid concentrated exposure to unguarded hazardous machinery. The claimant cannot drive or operate moving machinery. The claimant is limited to simple, routine, and repetitive tasks that require simple decision-making and the exercise of simple judgment. The claimant can handle occasional and minor changes in the workplace. The claimant can have brief and superficial interaction with coworkers and supervisors; and no direct public service jobs but can handle brief and superficial interactions with the public.

5.     The claimant has no past relevant work.

6.     The claimant was born [in 1963] and was 47 years old, which is defined as a younger individual age 45-49, on the date the application was filed.

7.     The claimant has a limited education and is able to communicate in English.

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.      The claimant has not been under a disability, as defined in the Social Security Act, since December 6, 2010, the date the application was filed.

(AR 13-23).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Medical Background

In October 2010, an electromyogram ("EMG") was performed due to Plaintiff's history of severe pain in both lower extremities and her lower back. The EMG impression was an abnormal study showing evidence of peripheral neuropathy.

On November 10, 2010, Plaintiff was admitted to the hospital with abdominal pain, and it was discovered that she had markedly high blood sugar levels. She was discharged on November 14, 2010, with diagnoses of neuropathic pain, diabetes mellitus, depression, and high cholesterol.

Plaintiff was admitted to the hospital November 22, 2010. On December 1, 2010, she underwent a triple coronary artery bypass grafting and mitral valve repair. She was additionally diagnosed with congestive heart failure. After more than two weeks in the hospital, she was released on December 8, 2010. However, subsequent infection at the incision site and eventually in the sternum led to several additional surgeries and ongoing pain.

On December 15, 2010, Plaintiff complained of chest pain and was admitted to the hospital for eight days. She was diagnosed with methicillin-resistant Staphylococcus aureus (MRSA) sternal wound infection. Plaintiff was released on December 22, 2010. On December 24, 2010, Plaintiff had complaints of chest pain and anxiety; she was admitted to the hospital for another six days. She was again treated for MRSA and discharged from the hospital on December 29, 2010.

Plaintiff visited Charles Okoro, D.O., on February 14, 2011, with complaints of chest pain. Dr. Okoro indicated that Plaintiff's "functional history" was that she did not suffer from any physical disability and that her daily living activities were normal. Dr. Okoro noted that Plaintiff lost over fifty pounds in two months from a failure to thrive. Dr. Okoro stated that, due to Plaintiff's poor pre-op ejection fraction, she was too weak for her routine echo test.

On February 24, 2011, Plaintiff was admitted to the hospital for approximately two weeks. She had drainage at the wound site from the December 2010 bypass surgery. On February 25, 2011, doctors debrided the sternal wound, removed the sternal wires, and performed a sternal wound biopsy. Two days later, doctors performed a cardiopulmonary bypass, patch repair of the right ventricular fistula, total sternotomy with sternal wound debridement, and bilateral pectoral flaps.

On March 2, 2011, the pathology report of the sternotomy specimen showed severe acute chronic osteomyelitis and marked fibrosis of the bone marrow. Plaintiff was discharged from this hospital stay on March 9, 2011.

J. Smejkal, M.D., performed a consultative exam at the state agency's request on March 21, 2011. Dr. Smejkal noted that Plaintiff walked with a straight posture and appeared comfortable in the seated and supine position. Dr. Smejkal also noted that Plaintiff was very sore from recent surgery and moved very slowly, holding the lower part of her chest. Shortness of breath on exertion

was noted; however, there was no chest pain. He indicated that Plaintiff had a surgical scar and staples in her upper abdomen and lower chest due to recent surgery. No range of motion issues were noted in the spine, upper extremities, or lower extremities. Dr. Smejkal did note generalized weakness to the upper extremities due to recent surgery. Plaintiff had a normal gait, could stoop and squat with difficulty, could get on and off the examination table with difficulty but did not require assistance, and was able to stand from a sitting position with difficulty.

Plaintiff visited Charles Okoro, D.O., on April 1, 2011. A surgical/traumatic scar was seen on the sternum, and the site of the recent surgical wound was clean. Plaintiff stated that she was doing much better at this time. Dr. Okoro's assessment included: coronary artery disease, cardiomyopathy, congestive heart failure, costochondritis following the recent sternal surgery, and "disruption of internal operation wound of the sternum." (AR 729).

On April 27, 2011, Plaintiff visited Nathaniel Ross, M.D. At this visit, Plaintiff stated that her quality of life was currently good. Her symptoms included chest pain at rest and related to the sternal wound.

CT imaging of Plaintiff's chest was taken on May 12, 2011. It was noted that most of the sternum had been removed during the February surgery. There was a finding of an extensive area of deep soft tissue emphysema as well as a rounded soft tissue density which was located just anterior to the proximal ascending aorta. A thoracic surgery consult was ordered.

On May 13, 2011, Plaintiff was admitted to the hospital for nearly two more weeks. On May 16, 2011, she underwent the following procedures: repair of the mycotic pseudoaneurysm of the ascending aorta with a homograft patch under deep hypothermic circulatory arrest, radical sternal debridement, redo sternal reentry, left pectoralis advancement muscle flap, and omental flap.

Plaintiff was discharged with a PICC line for intravenous antibiotics and a bulb drain out of her left anterior chest. The May 25, 2011 discharge instructions directed that Plaintiff was not to lift, push, or pull more than ten pounds for four weeks or until cleared by her surgeon.

On June 15, 2011, Plaintiff visited Nathaniel Ross, M.D. Plaintiff indicated that her quality of life since her diagnosis was about the same as before the diagnosis. She also reported chest pain at rest and related to the sternal wound.

On June 16, 2011, Dr. Smejkal again performed a consultative exam at the State agency's request. At the exam, Plaintiff stated that she had numbness and tingling from her knees down to both feet. She stated that she felt weak and feared that she would fall. At the examination, Plaintiff was very unbalanced and weak; she needed help walking and standing. She also complained of pain and throbbing to her left arm, and she was unable to pick up anything over five pounds. Dr. Smejkal noted that she was unable to raise her left arm past her waist and had weakness in her grip. On cardiovascular exam, Plaintiff had chest pain and shortness of breath on exertion.

Dr. Smejkal was unable to test Plaintiff's upper extremity and spinal range of motion due to her recent surgery. Strength in all major upper extremity muscle groups was rated at 3 out of 5. Dynamometer testing revealed that Plaintiff could generate 8 kilograms of force with the right hand and 6 kilograms of force with the left hand. Dr. Smejkal could not test the lower extremities due to the recent surgery. Strength in the lower extremity muscle groups was also rated at 3 out of 5. Dr. Smejkal noted that Plaintiff had an unsteady gait and needed assistance. Plaintiff could not stoop or squat due to the recent surgery, could not walk heel to toe tandemly, got on and off the examination table with difficulty and with required assistance, and was able to stand from a sitting position with difficulty. He noted that she had recently had surgery. Further, Dr. Smejkal indicated that Plaintiff

had abnormal grip strength in both hands with good fine finger manipulative abilities. A range of motion test on the spine, upper extremities, and lower extremities could not be performed due to weakness throughout Plaintiff's body.

On June 8, 2011, state agency consultant Joseph N. Gaddy, M.D., completed a physical residual functional capacity assessment. He stated that Plaintiff would be expected to tolerate sedentary activity twelve months after the original December 2010 surgery. On July 25, 2011, B. Whitley, M.D., affirmed this assessment.

Plaintiff visited Dr. Ross on September 12, 2011, with complaints of left leg and left shoulder pain, as well as swelling in the hands. Dr. Ross diagnosed fistula of heart, insulin-dependent diabetes, coronary artery disease, essential hypertension, mixed hyperlipidemia, peripheral neuropathy, and mediastinitis. On review of her cardiovascular system, Plaintiff was negative for chest pain.

On September 26, 2011, Plaintiff again visited Dr. Ross with complaints of left leg pain and chest pain at rest and related to the sternal wound. Diagnoses at this visit included peripheral neuropathy, shoulder pain, and mediastinitis. A referral to a pain specialist for her left shoulder pain was initiated.

On October 19, 2011, Plaintiff visited Dr. Ross with complaints of left shoulder pain. Symptoms included chest pain at rest and related to the sternal wound. Dr. Ross again noted that a referral was initiated for a pain specialist for treatment of her shoulder.

Dr. Ross noted shoulder pain on January 10, 2012, and February 24, 2012. At both visits, Dr. Ross referred Plaintiff to a chronic pain specialist for shoulder pain. Additionally, both reports indicated symptoms of chest pain at rest and related to the sternal wound as well as diagnoses of

shoulder pain, mediastinitis, and peripheral neuropathy. At both visits, Plaintiff was negative for chest pain on review of her cardiovascular system. The February 24, 2012 record indicates that the mediastinitis was resolved.

Plaintiff was hospitalized for severe, sharp chest pain on March 4, 2012. The chest pain was deemed related to postsurgical changes in her pectoralis muscle from the past bypass surgery. A central line was inserted. Dr. Okoro saw Plaintiff in the hospital on March 5, 2012. Plaintiff reported that she had an operation in the past that took muscles from her shoulder to cover her chest. The pain was worsened by recent weight gain. Plaintiff was discharged from this stay on March 6, 2012.

On March 9, 2012, Plaintiff visited Dr. Ross, and her symptoms included chest pain at rest and related to sternal wound. It was noted that peripheral neuropathy symptoms were relieved with neurontin. On review of her cardiovascular system, Plaintiff was negative for chest pain. Shoulder pain, mediastinitis, and peripheral neuropathy were among the diagnoses.

A visit to Dr. Ross on April 2, 2012, resulted in similar diagnoses. Symptoms at this visit again included chest pain at rest and related to the sternal wound. The report indicates that her peripheral neuropathy was relieved with neurontin.

On April 9, 2012, Dr. Okoro wrote a note on his prescription pad: "To whom it may concern, [Plaintiff] is not well enough to do any kind of work because[sic] persistent symptoms and disability from a complex/complicated open heart surgery." (AR 1117).

On April 13, 2012, Plaintiff visited Dr. Ross with complaints of back pain. Plaintiff was negative for chest pain on review of her cardiovascular system. The diagnoses included shoulder pain, neuropathy, and mediastinitis.

Plaintiff visited Adolphus Anekwe, M.D., on April 26, 2012. He diagnosed her with cerebral vascular accident, coronary artery disease, hypertension, diabetes mellitus, MRSA, scar of sternum, syncope, persistent vomiting, hyperglycemia, and status post three heart surgeries.

Dr. Anekwe completed a form for Plaintiff on June 11, 2012. The quality of this form is poor; however, the legible parts reveal diagnoses of chronic pain syndrome, diabetes, left shoulder pain, and coronary artery disease. Dr. Anekwe opined that Plaintiff cannot work because she can do no pushing, pulling, or lifting. He answered "no" to the question of whether she could perform "light work." He also answered "no" to the question of whether she can work on medication, explaining that she could not due to dizziness. Dr. Anekwe indicated that he treated Plaintiff monthly.

Dr. Anekwe also completed a physical medical source statement for Plaintiff on July 26, 2012. He indicated that he had treated Plaintiff for over two years. He noted that Plaintiff is easily fatigued and suffers from chronic chest pain, dizziness, and leg pain with neuropathy. The following diagnoses were listed: type II diabetes, status/post coronary artery bypass graft, coronary artery disease, scar of sternum, chronic pain syndrome, anxiety neurosis, and pseudo-aneurysm of aortic arch. He noted that Plaintiff had chest pain both while resting and with exertion due to a complicated sternotomy with plasty. Dr. Anekwe stated that Plaintiff is very limited in a competitive work situation. He also indicated that Plaintiff could sit for less than 2 hours total and stand for less than 2 hours total in an 8-hour workday. Dr. Anekwe opined that Plaintiff should rarely lift anything over ten pounds and should elevate her feet above heart-level. Dr. Anekwe indicated that Plaintiff could only use her hands to grasp, turn, or twist objects less than 20% of an 8-hour work day and reach overhead with both arms for less than 10% of an 8-hour workday. He stated that symptoms would be severe enough to interfere with Plaintiff's attention and concentration 25% or more of the

workday. He opined that she is incapable of even "low stress" work because of pain related to complicated open heart surgery.

## B. Hearing Testimony

Plaintiff testified that she lived with her aunt and her 14-year-old granddaughter. She stated that she does not drive due to neuropathy in her legs and that she has difficulty walking due to swelling. She stated that she cannot work because her medications make her drowsy and forgetful. She stated that her legs hurt "awfully bad," and when she tries to walk her legs swell. She stated that she was told the muscle in her chest was not healing. She testified that her medications work, but they only take the pain away for a few minutes, after which the pain returns. She stated that she sees Dr. Anekwe at least twice a month, and Dr. Okoro once a month. She stated that she cannot raise her left arm over her head. When asked by the ALJ how much she could lift, she said she is not supposed to lift anything heavy–nothing over a gallon of milk–because nothing protects her heart. She further stated that she does not do too much with her left hand but can do some things with her right hand. She stated that she can only stand for a few minutes before she gets tired, and she can walk about half of a block before needing rest. She stated that she can only sit for about 30 minutes. She testified that when she rides in a car, she has a pillow up to her chest with a seatbelt. During the day, she alternates between lying down, sitting, and walking around. She stated that pain medication helps a little bit but that she is constantly in pain. She stated that she would not be able to take care of herself if her aunt was not around. She testified that most of her medications are prescribed by Dr. Anekwe and that Dr. Anekwe has treated her diabetes for the last two years.

### C. Vocational Expert

During the hearing, the ALJ posed a hypothetical question to the vocational expert that incorporated the limitations included in the RFC. The vocational expert responded that jobs existed that such a hypothetical individual could perform. On cross-examination, Plaintiff's attorney asked if the hypothetical individual could perform this work if she was limited to grasping, turning, and twisting objects only 20% of the time. The vocational expert responded that all jobs would be precluded. The vocational expert also testified that no work exists for an individual who is off task 25% or more of the work day.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning

of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as

an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but, considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite

her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that reversal for an award of benefits or reversal and remand for further proceedings is required because the ALJ (1) failed to properly evaluate whether she meets or equals Listing 11.04, (2) made an improper RFC assessment, and (3) improperly weighed the state agency physicians' opinions. Because the outcome of this appeal turns on the weight the ALJ gave to Plaintiff's treating physicians' 2012 opinions and to the state agency consultants' 2011 opinions, the Court begins with this issue.

### A. Weight Given to Physician Opinions

Plaintiff argues that the ALJ improperly weighed her treating physicians' opinions and erred by giving significant weight to the opinions of the state agency consultants. An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

> treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. § 416.927(c)(2); *see also Schaaf*, 602 F.3d at 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p;

SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996). In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf*, 602 F.3d at 875.

The factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. § 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist the patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives good reasons. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875. The ALJ cannot pick and choose the evidence that favors his final decision; rather, the ALJ must articulate his analysis well enough for an appellate court to follow and review his reasoning. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).

In the context of both Listing 11.04 and the RFC analysis, Plaintiff argues that the ALJ failed to adequately explain his reasons for disregarding the opinion of Dr. Anekwe, one of Plaintiff's treating physicians. Indeed, the ALJ failed to build an accurate and logical bridge from the evidence

to his decision to give little weight to the opinion of Dr. Anekwe by omitting from his discussion several key aspects of Dr. Anekwe's opinion. *Compare McKinzey v. Astrue*, 641 F.3d 884, 889-92 (7th Cir. 2011); *Berger v. Astrue*, 516 F.3d 539, 544-45 (7th Cir. 2008).

In his decision, the ALJ summarized Dr. Anekwe's opinions, noting that Dr. Anekwe found in June 2012 that Plaintiff could not push, pull, or lift and that, in his July 2012 Physical Medical Source Statement, Dr. Anekwe opined that Plaintiff could sit for less than 2 hours and stand or walk for less than 2 hours in a workday and would need to elevate her feet above her heart. In weighing this opinion, the ALJ wrote, "I give little weight to the opinions of Dr. Anekwe, as they are inconsistent with the record." (AR 21).

To support this finding of inconsistency, the ALJ first cited the March 21, 2011 and June 16, 2011 reports of Dr. Smejkal, the consultative examiner, and reported that Dr. Smejkal "noted at the consultative examinations that [Plaintiff] appeared comfortable in the seated and supine positions and had full range of motion in her back." (AR 21 (citing Exs. 17F, 27F)). In both reports, Dr. Smejkal stated under "General Appearance" that Plaintiff "appears comfortable in the seated and supine position." (AR 713, 940). However, the March 2011 report was the only one in which Dr. Smejkal indicated that Plaintiff had full range of motion in her back. In contrast, in June 2011, Dr. Smejkal was unable to test Plaintiff's range of motion due to her recent surgery. Further, in the June 2011 report, Dr. Smejkal indicated that Plaintiff reported numbness and tingling in her feet. Dr. Smejkal also found on examination that Plaintiff had pain in her left arm/shoulder and that she could not raise her left arm; she was unable to squat or stoop, walk heel to toe tandemly, get off the examination table without difficulty, or stand from a seated position without difficulty; she had an unsteady gait and needed assistance; and she had diminished strength. Thus, the ALJ inaccurately

cites the June 2011 report in support of a finding that Plaintiff had full range of motion in her back and fails to discuss Dr. Smejkal's findings that are favorable to Plaintiff's claim of disability.

The ALJ also did not address the findings of Dr. Ross that are consistent with Dr. Anekwe's opinion. Dr. Ross repeatedly documented chest pain at rest and related to the sternal wound, shoulder pain, and mediastinitis through 2011 and the first half of 2012.

The ALJ then attempts to discredit Dr. Anekwe by finding that Plaintiff's hearing testimony that she cannot sit for more than 30 minutes because of thigh pain is inconsistent with the record. This alleged inconsistency is based on the ALJ's perception that she only once mentioned leg pain at an exam, which was with Dr. Ross in September 2011. The ALJ, *not* Dr. Ross, equates Plaintiff's complaint of left leg pain with Dr. Ross' diagnosis of neuropathy and then contrasts that with Plaintiff's report that medication relieved her neuropathy. "Peripheral neuropathy, a result of damage to [the] peripheral nerves, often causes weakness, numbness and pain, usually in [the] hands and feet. It can also affect other areas of [the] body." http://www.mayoclinic. org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948 (last visited 3/16/2015). There is no basis in the record for the ALJ to conflate Plaintiff's left thigh pain with her peripheral neuropathy.

Finally, the ALJ cites Dr. Okoro's reports from June 24, 2011 and September 19, 2011, that Plaintiff had normal gait, balance, and stance. The ALJ is correct. But the ALJ does not explain how these findings address Plaintiff's allegation that she cannot sit or stand for long periods of time.

Second, the ALJ discredits Dr. Anekwe's opinion that Plaintiff needs to elevate her feet based on the fact that there is no other mention of such a restriction in the record nor are there complaints of swelling. To this extent, the ALJ is correct. The record does not appear to support a

requirement that Plaintiff elevate her feet. Substantial evidence supports the ALJ's decision to give little weight to this opinion.

However, in making that finding, the ALJ relies on findings by Dr. Okoro that Plaintiff "had no physical disability and could perform her normal activities of daily living." (AR 21, ¶1 (citing (AR 611-616, 727-730, 1055-1062))). And, the ALJ relies on these "findings" of Dr. Okoro in other places in his decision. *See* (AR 18, ¶ 2; AR 18, ¶ 3; AR 20, carryover paragraph; AR 21, ¶ 2). From a careful review of the record, it appears that the ALJ has misunderstood the meaning of those "findings." On February 14, 2011, *before* her March and May 2011 surgeries, Dr. Okoro found under the section for "Social History" and the subcategory of "Functional": "No physical disability and activities of daily living *were* normal." (AR 612) (emphasis added). This is a historical statement and not one of her present functionality. Dr. Okoro makes the same "Social History" finding, cited by the ALJ, on April 1, 2011 (AR 727), June 24, 2011 (AR 1055), and September 19, 2011 (AR 1059). These historical findings by Dr. Okoro that are identical before and after the removal of Plaintiff's sternum are not evidence that discredits Dr. Anekwe's opinion.

Thus, the ALJ's analysis that Dr. Anekwe's identified opinions were "inconsistent with the record," (AR 21), is in error. In addition, the ALJ did not discuss the length of the treatment relationship, which was twice a month for two years.[1]

More importantly, in relation to both the analysis of Listing 11.04 and the RFC determination, the ALJ did not acknowledge, much less weigh, Dr. Anekwe's opinions that Plaintiff could only use her hands to grasp, turn, or twist objects less than 20% of an 8-hour workday and

---

[1] The Court recognizes the colloquy at the hearing regarding the absence of Dr. Anekwe's treatment records from the administrative record. But Dr. Anekwe indicated on the medical source statement that he had been treating Plaintiff for two years, and Plaintiff testified that Dr. Anekwe had treated her for two years for her diabetes and that she saw him twice a month. The ALJ did not discuss this evidence.

could reach over head with both arms less than 10% of an 8-hour workday. The ALJ also did not discuss Dr. Anekwe's opinion that Plaintiff would be off task at least 25% of the workday. This opinion is significant because the vocational expert testified that no work would be available for a person who is off task 25% of the workday.

Remand is required because the ALJ did not properly support his finding that certain of Dr. Anekwe's opinions were inconsistent with the record and because the ALJ failed to address, much less weigh, Dr. Anekwe's favorable opinions regarding grip, reaching, and being off task. *See Campbell*, 627 F.3d at 306 ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)).

As for the April 2012 opinion of Dr. Okoro that Plaintiff could not work, the ALJ give this opinion little weight primarily based on the "Social History" finding that Plaintiff "had no physical disability and could perform her normal activities of daily living." (AR 21). As discussed above, the ALJ has misunderstood this statement to be a present assessment when in fact it is historical. Although Plaintiff does not directly argue that the ALJ improperly weighed the April 2012 opinion of Dr. Okoro, the ALJ used the weight given to Dr. Okoro's opinion to support his decision to give significant weight to the opinions of the state agency reviewers. On remand, the ALJ is directed to properly consider these statements by Dr. Okoro in weighing Dr. Okoro's April 2012 statement regarding Plaintiff's ability to work.

Next, as argued by Plaintiff, the significant weight the ALJ gave to the consultative reviewers' opinions is suspect in light of the time that elapsed between their June and July 2011 opinions and the August 2012 hearing given the intervening medical records, the subsequent treating

physician opinions, and Plaintiff's testimony. In June 2011, Dr. Gaddy, the state agency consultant, opined that Plaintiff was expected to tolerate sedentary activity twelve months after the December 2010 surgery, which would have been December 2011. This assessment was affirmed by Dr. Whitley in July 2011. Over a year later, in August 2012, Plaintiff appeared before the ALJ for her hearing. Thus, the state agency examiners did not have a chance to review more than a year of medical records. Despite Dr. Gaddy's expectations, there is ample medical evidence from the date of his opinion through the hearing date demonstrating that Plaintiff's impairments did not improve as he had expected. Plaintiff continued to treat with Dr. Anekwe, Dr. Okoro, and Dr. Ross on multiple occasions, including a three-day hospitalization in March 2012 because of chest pain related to the surgeries that resulted in the removal of her sternum.

In giving the consultants' opinions significant weight, the ALJ found their opinions consistent with the record, finding that Plaintiff is limited to sedentary work because of peripheral neuropathy and has diminished grip strength following her bypass and subsequent surgeries that restrict her ability to lift and carry objects, limitations in the time she can sit, stand, and walk at one time, limitations in the non-dominant left upper extremity, postural limitations, and hazard limitations. The ALJ then discredited both Dr. Anekwe's and Dr. Okoro's opinions. But, Dr. Gaddy's opinion was essentially a prediction, and the subsequent records suggest a different outcome.

Because neither of the state agency physicians had available to them the treatment records of Dr. Okoro, Dr. Ross, or Dr. Anekwe between July 2011 and August 2012 and because the ALJ did not properly weigh Dr. Anekwe's and Dr. Okoro's opinions which were given a year later and just prior to the August 2012 hearing, the Court cannot find that the weight given to the state agency

reviewers' opinions is supported by substantial evidence. Remand is required. *See Ivey v. Astrue*, cause no. 2:11-CV-83, 2012 WL 951481, at *13 (N.D. Ind. Mar. 20, 2012) (recognizing that an ALJ's decision to give more weight to a reviewing state agency physician's opinion "cannot stand where it lacks evidentiary support and is based on an inadequate review of [the Plaintiff's] subsequent medical record" (*Staggs v. Astrue*, 781 F. Supp. 2d 790, 794-95 (S.D. Ind. 2001)); *Bellinghiere v. Astrue*, No. 10 C 6184, 2011 WL 4431023, at *8 (N.D. Ill. Sept. 22, 2011) (finding that the state agency physicians' "opinions relied upon by the ALJ to contradict the opinions of [Plaintiff's] treating physicians were not based on a complete review or an accurate summary of all the relevant medical evidence" and, therefore, remand was necessary).

Given that Plaintiff's last consultative examination occurred more than a year before the hearing and subsequent evidence indicates she had not healed as the state examiners expected, this case is remanded for further administrative proceedings. On remand, the ALJ may consider ordering another medical evaluation to determine Plaintiff's ability to perform work related activities. *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011); *Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000).

## B. Step Three Listing Analysis

At step three of the five-step analysis of a claimant's disability, the ALJ determines if the claimant has an impairment or combination of impairments that meets or equals one of the impairments in the Listing of Impairments. 20 C.F.R. § 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1; *see also Barnett*, 381 F.3d at 668. If a claimant meets the criteria for a disabling impairment under the listings, she is presumptively disabled and the analysis ends. 20 C.F.R. § 416.925(a); *see also Barnett*, 381 F.3d at 668. In his decision, the ALJ "must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Id.* at 668-69. The ALJ must also evaluate evidence

that is favorable to the claimant. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) ("[The ALJ's] failure here to evaluate any of the evidence that potentially supported [Plaintiff's] claim does not provide much assurance that he adequately considered [the] case"); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (remanding, in part, because the ALJ failed to mention the strongest evidence supporting a disability finding).

Plaintiff argues that the ALJ failed to evaluate evidence that demonstrates that she meets Listing 11.04, which provides:

> 11.04 Central nervous system vascular accident. With one of the following more than 3 months post-vascular accident:
> A. Sensory or motor aphasia resulting in ineffective speech or communication; or
> *B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).*

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04 (emphasis added). A cerebral vascular accident is commonly known as a stroke. *See* http://www.nlm.nih.gov/medlineplus/ency/article/000726.htm (last visited Mar. 16, 2015). It is not clear from the record whether the ALJ considered Listing 11.04 because Dr. Anekwe diagnosed Plaintiff with a cerebral vascular accident on April 26, 2012 (although there is no other such diagnosis in the record) or because the Listing for the "Cardiovascular System" provides that cardiomyopathy is evaluated under Listing 4.02, 4.04, 4.05, *or 11.04*, depending on its effects on the claimant. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(H)(3).

Regardless, in finding that Plaintiff did not meet Listing 11.04(B), the ALJ considered both her gross and dexterous movements as well as her gait and station. As for the former, the ALJ noted that Dr. Smejkal found in June 2011 that she had diminished grip strength but that she had no issues with her fine finger manipulation. As for gait, the ALJ noted that Dr. Smejkal initially found a normal gait in March 2011 but found an unsteady gait in June 2011 after Plaintiff's surgery; the ALJ

noted that in June 2011 Plaintiff was still recovering and was still on IV fluids. The ALJ also cited Dr. Ross' treatment note from June 24, 2011, that Plaintiff had good gait and balance.

However, as noted in the previous section, the ALJ did not discuss Dr. Anekwe's subsequent findings that Plaintiff could only use her hands to grasp, turn, or twist objects less than 20 percent of an 8-hour workday and could reach overhead with both arms for less than 10% of an 8-hour workday. These findings, if they had been discussed and credited, could lead to a finding that indicates persistent disorganization of motor function in two extremities. The Commissioner notes that the examination findings from Dr. Smejkal and the treatment notes from Dr. Ross show problems with the use of her left arm only, and, thus, Plaintiff has not shown that she meets all the requirements of the Listing as to both extremities. But, Dr. Anekwe's opinion applies to both extremities, and the ALJ ignored that opinion. The Court will not weigh the evidence in the ALJ's stead. Because this case is being remanded for a proper determination of the weight that should be given to this evidence, the Court directs the ALJ to address the following evidence, as appropriate, in determining whether Plaintiff meets Listing 11.04(B): the findings by Dr. Anekwe regarding Plaintiff's use of her hands and her arms; any subsequent findings by state agency examiners or reviewers; Plaintiff's visits to Dr. Ross and why Plaintiff never saw a pain specialist for her left arm pain; and Plaintiff's hearing testimony.

### C. RFC Determination

Last, Plaintiff argues that the ALJ's RFC assessment does not take into account all of Plaintiff's impairments or explain how they were taken into account in his decision. The Commissioner argues that the RFC is supported by substantial evidence. The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. §

416.945(a). The determination of Plaintiff's RFC is a legal decision rather than a medical one. 20 C.F.R. § 416.927(e)(2); *Diaz*, 55 F.3d at 306 n. 2. The RFC is an issue at steps four and five of the sequential evaluation process. SSR 96–8p. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p at *5. In addition, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." *Id*. Although the ALJ need not discuss all the evidence, he must consider all the evidence that is relevant to making a determination of disability and give enough information to allow for meaningful review. *Clifford*, 227 F.3d at 870; *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004); SSR 96–8p.

Plaintiff makes several arguments regarding the ALJ's treatment of the evidence. First, she argues that the ALJ failed to mention inconsistencies in Dr. Smejkal's reports. Plaintiff faults the ALJ for noting on the one hand that Dr. Smejkal stated that Plaintiff appeared comfortable in the seated and supine positions at the March 21, 2011 exam but that she moved slowly due to recent surgery but for failing to note on the other hand that Dr. Smejkal stated that Plaintiff moved very slowly while holding the lower part of her chest. Plaintiff has not explained how these statements are inconsistent. The ALJ acknowledged that Plaintiff was moving slowly; the fact that Plaintiff held her chest while *moving* is not inconsistent with comfort in a seated position. Plaintiff also notes that

at the same exam, there was no "chest pain," but at the same exam Dr. Smejkal noted Plaintiff's surgical scar and staples from the recent surgery. These statements are not inconsistent as Dr. Smejkal's finding of "no chest pain" was part of his cardiovascular examination. Plaintiff is also incorrect that the ALJ failed to address Dr. Smejkal's statement that Plaintiff could not raise her arm past her waist; he did. Thus, the ALJ did not err as suggested by Plaintiff in reviewing these examination findings.

In contrast, Plaintiff is correct that the ALJ noted Dr. Smejkal's March 2011 finding that she had full range of motion but did not acknowledge Dr. Smejkal's June 2011 finding that Plaintiff was unable to perform range of motion. Plaintiff also contests the weight given to Dr. Anekwe's opinion, which the Court addressed above. Once the ALJ has properly weighed Dr. Anekwe's opinion, which is consistent in many respects with Dr. Ross' treatment records, the ALJ will be able to incorporate the new findings into the RFC determination. Finally, the ALJ again improperly reads Dr. Okoro's opinion, this time with regard to "chest pain." The ALJ notes that in June 2011, Dr. Okoro found that Plaintiff experienced no "chest pain," (AR 20 (citing (AR 1055))); yet this finding was in the context of other cardiac related findings and does not reference the pain she was experiencing at the site of her surgery that removed her sternum or in her shoulder. Again, Dr. Ross consistently reported throughout the second half of 2011 and the first half of 2012 that Plaintiff reported pain at the site of her sternal wound.

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. On remand, the ALJ is directed to address medical evidence identifying Plaintiff's current, post-recovery range of motion, Dr. Anekwe's

opinion, and the consistency between Dr. Ross' records and the opinions of Dr. Okoro and Dr. Anekwe in assessing the RFC.

### D. Request for an Award of Benefits

An award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue* , 631 F.3d 411, 415 (7th Cir. 2011). As is evident from the discussion above, remand, not an immediate award of benefits, is required.

### CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of Her Motion to Reverse the Decision of the Commissioner of Social Security [DE 12], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order. The Court **DENIES** Plaintiff's request to award benefits.

So ORDERED this 17th day of March, 2015.

s/ Paul R. Cherry _____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record